# EXHIBIT B

## AMENDMENT TO SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This amendment ("the Amendment") to the Parties' Settlement Agreement and Mutual Release (the "Settlement Agreement "), dated July 1, 2010, is made by and between Mercedes-Benz USA, LLC ("MBUSA"), a Delaware limited liability company with its principal office and place of business at One Mercedes Drive, Montvale, New Jersey 07645, and Trans-Atlantic Motors, Inc. ("Trans-Atlantic"), a Massachusetts corporation with a principal office and place of business at 25 Falmouth Road, Hyannis, Massachusetts (MBUSA and Trans-Atlantic, together, the "Parties").

WHEREAS, Trans-Atlantic has requested an extension of time to enter into an agreement with Prime Motor Group LLP or another affiliated entity ("Prime Motor") for the purchase of Trans-Atlantic's Mercedes-Benz assets and franchise (the "Buy-Sell") from July 14, 2010 to July 23, 2010; and

WHEREAS, MBUSA desires to permit Trans-Atlantic additional time to enter the Buy-Sell;

NOW, THEREFORE, in consideration of the mutual promises made herein and in the Settlement Agreement, MBUSA and Trans-Atlantic agree that Paragraph 1 of the Settlement Agreement is hereby stricken and replaced with the following:

1.    **MBUSA Review of Buy-Sell.** In the event that Trans-Atlantic enters into the Buy-Sell on or before July 23, 2010, MBUSA (a) will review the Buy-Sell; (b) will communicate its decision to Trans-Atlantic on whether or not it approves the Buy-Sell in writing within 30 days of receiving a copy of the Buy-Sell from Trans-Atlantic; and (c) will not unreasonably withhold consent to the Buy-Sell.  MBUSA will not withhold consent on the ground that the Buy-Sell is not subject to the pending Notice of Termination.

All other provisions of the Settlement Agreement remain in full force and effect.

Dated this 21st day of July, 2010

MERCEDES-BENZ USA, LLC

By: _____
     Charles L. Shady
     General Counsel
     Duly Authorized

By: _____
     Mark M. Kelly
     Counsel
     Duly Authorized

Dated this _____ day of July, 2010

TRANS-ATLANTIC MOTORS, INC.

By: _____
     Algimantas Krisciunas
     President/ Treasurer
     Duly Authorized

All other provisions of the Settlement Agreement remain in full force and effect.

Dated this _____ day of July, 2010

MERCEDES-BENZ USA, LLC

By: _____
      Charles L. Shady
      General Counsel
      Duly Authorized

By: _____
      Mark H. Kelly by Paula S. Staropoli
      Counsel
      Duly Authorized

Dated this _____ day of July, 2010

TRANS-ATLANTIC MOTORS, INC.

By: _____
      Algimantas Krisciunas
      President/ Treasurer
      Duly Authorized

# EXHIBIT C

## SECOND AMENDMENT TO
## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This second amendment ("the Second Amendment") to the Parties' Settlement

Agreement and Mutual Release (the "Settlement Agreement "), dated July 1, 2010, is made by

and between Mercedes-Benz USA, LLC ("MBUSA"), a Delaware limited liability company with

its principal office and place of business at One Mercedes Drive, Montvale, New Jersey 07645,

and Trans-Atlantic Motors, Inc. ("Trans-Atlantic"), a Massachusetts corporation with a principal

office and place of business at 25 Falmouth Road, Hyannis, Massachusetts (MBUSA and Trans-

Atlantic, together, the "Parties").

WHEREAS, Trans-Atlantic has reached final terms of an agreement with an affiliated

entity of Prime Motor Group LLP ("Prime Motor") for the purchase of Trans-Atlantic's

Mercedes-Benz assets and franchise (the "Buy-Sell") ; and

WHEREAS Prime Motor cannot execute the written agreement until the week of July 26,

2010; and

WHEREAS, MBUSA desires to permit Trans-Atlantic additional time to execute the

written Buy-Sell with Prime Motor;

NOW, THEREFORE,  in consideration of the mutual promises made herein and in the

Settlement Agreement, MBUSA and Trans-Atlantic agree that Paragraph 1 of the Settlement

Agreement as amended pursuant to the first amendment thereto is hereby stricken and replaced

with the following:

1.      **MBUSA Review of Buy-Sell.**  In the event that Trans-Atlantic enters into the

Buy-Sell on or before July 27, 2010, MBUSA (a) will review the Buy-Sell; (b) will communicate

its decision to Trans-Atlantic on whether or not it approves the Buy-Sell in writing within 30

days of receiving a copy of the Buy-Sell from Trans-Atlantic; and (c) will not unreasonably

withhold consent to the Buy-Sell.  MBUSA will not withhold consent on the ground that the Buy-Sell is not subject to the pending Notice of Termination.

All other provisions of the Settlement Agreement remain in full force and effect.

Dated this 23rd day of July, 2010

MERCEDES-BENZ USA, LLC

By: _____
    Charles L. Shady
    General Counsel
    Duly Authorized

By: _____
    Mark N. Kelly
    Counsel
    Duly Authorized

Dated this 23rd day of July, 2010

TRANS-ATLANTIC MOTORS, INC.

By: _____
    Algimantas Krisciunas
    President/ Treasurer
    Duly Authorized

withhold consent to the Buy-Sell. MBUSA will not withhold consent on the ground that the

Buy-Sell is not subject to the pending Notice of Termination.

All other provisions of the Settlement Agreement remain in full force and effect.

Dated this 23rd day of July, 2010                    MERCEDES-BENZ USA, LLC


By: _____
    Charles L. Shady
    General Counsel
    Duly Authorized

By: _____
    Mark H. Kelly
    Counsel
    Duly Authorized


Dated this 23rd day of July, 2010                    TRANS-ATLANTIC MOTORS, INC.

By: _____
    Algimantas Krisciunas
    President/ Treasurer
    Duly Authorized

# EXHIBIT D

**Kathryn Conde**

| | |
|---|---|
| **From:** | Dawn Curry |
| **Sent:** | Tuesday, July 27, 2010 4:05 PM |
| **To:** | 'Sullivan, John J.' |
| **Subject:** | Asset Purchase Agreement |
| **Attachments:** | TransAtlantic Prime APA Executed.pdf |

John,

Attached is a fully executed version of the Trans-Atlantic/Prime APA .   I will also send you a copy via overnight mail.

Dawn M. Curry

 Nutter

Nutter McClennen & Fish LLP
Seaport West
155 Seaport Boulevard, Boston, MA 02210
Direct line 617.439.2286
Fax 617.310.9286
www.nutter.com

This Electronic Message contains information from the law firm of Nutter, McClennen & Fish, LLP, which may be privileged and confidential.  The information is intended to be for the use of the addressee only.  If you have received this communication in error, do not read it.  Please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.  Thank you.

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), made this 27th day of July, 2010 (the "Effective Date") by and between **TRANS-ATLANTIC MOTORS, INC.**, a Massachusetts corporation with its principal place of business located at 25 Falmouth Road, Hyannis, Massachusetts (the "Seller"), **AMR AUTO HOLDINGS-MH, LLC**, a Delaware limited liability company (the "Buyer") and **AUTOMILE HOLDINGS, LLC**, a Delaware limited liability company (the "Parent").

### WITNESSETH:

WHEREAS, Seller is engaged in business as a Mercedes-Benz automobile dealership in Hyannis, Massachusetts (the "Dealership") operating pursuant to a dealer agreement with Mercedes-Benz USA, LLC (the "Manufacturer"); and

WHEREAS, Seller wishes to sell certain Assets (as more specifically described herein) used in its business, terminate its Mercedes-Benz new vehicle dealership business and arrange for the transfer (or new issuance) of its Mercedes-Benz Passenger Car Dealer Agreement and Mercedes-Benz Light Truck Dealer Agreements to the Buyer. Buyer desires to purchase the Assets, all upon the terms and conditions hereinafter set forth.

NOW THEREFORE, intending to be legally bound hereby, the parties agree as follows:

1.     THE ASSETS.

    1.1.    Assets. Subject to the terms and conditions hereinafter set forth, on the Closing Date (as defined below), Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller, all the following described assets (collectively, the "Assets") currently used in the operation of the Dealership:

    1.1.1.   Mercedes-Benz Franchise. The Mercedes-Benz franchise for the area including Barnstable, Duke, Nantucket and portions of Plymouth counties in Massachusetts (the "Mercedes- Benz Franchise").

    1.1.2.   Assets and Special Tools. Dealership specific, Manufacturer provided assets (point of sale materials and related Manufacturer provided items) and special tools set forth on Schedule 1.1.2 (the "Mercedes-Benz Special Tools").

    1.1.3.   Parts and Accessories. All new, originally packaged, usable, current, genuine and returnable Mercedes-Benz parts and accessories inventory, as provided for in Section 2.1.3 below (the "Mercedes-Benz Parts and Accessories").

    1.1.4.   New Vehicle Inventory. Provided Seller has the requisite certificates of origin and Retail Delivery Reports, all 2010 and 2011 new Mercedes-Benz vehicle inventory (not previously reported to the manufacturer as sold) with an MCO associated therewith, as provided for in Section 2.1.4 below; provided, however, Buyer shall have no obligation to purchase (i) any vehicle that has in excess of 200 miles on its odometer, (ii) any vehicle that has sustained material damage, (iii) any vehicle that has parts or accessories installed which would void the Manufacturer's warranty or (iv) any demo or loaner vehicle.

1.1.5.  Goodwill. Dealership goodwill, Mercedes-Benz signage (not under signage leases) customer list(s) and addresses including sales and services records (excluding any private customer information cannot legally be disclosed) related only Seller's Mercedes-Benz dealership.  Seller will permanently remove and delete all Mercedes-Benz references from its web site and provide referral to Buyer of all telephone calls or e-mails regarding Mercedes-Benz customer calls or inquiries for a period of one (1) year from Closing.

1.2.  Excluded Assets. Any assets of the Dealership not expressly included in the definition of Assets above, are expressly excluded from the transaction contemplated hereby including, without limitation, all account receivables and cash of Seller, all Leases and contractual obligations related to the Dealership, all incomplete repair orders, all real estate used in the business of Seller and all assets used in Seller's BMW or Volvo dealerships.

1.3.  Executory Contracts for the Sale of New Motor Vehicles. The parties anticipate that there will be, on the Closing Date, executory contracts between Seller and third-party purchasers for the sale of new vehicles. For the purpose of arranging for the proper fulfillment of said contracts, the parties agree that:

1.3.1.  At Closing, Seller shall assign to Buyer those contracts representing sales of ordered new motor vehicles to third-party purchasers with particular reference to the amount provided as a trade-in allowance (which allowance shall not exceed the reasonable market wholesale value of the trade-in) and concurrently remit to Buyer all deposits received by Seller in connection with said contracts. Buyer covenants and agrees to perform said contracts in place and instead of Seller. Buyer shall pay industry standard sales commission to Seller's sales employees responsible for the sale of 20% of gross profit after expenses defined as sales price less invoice plus costs added to the vehicle.  No payments shall be made on the holdback amounts. No sales overrides to others shall be paid.

1.3.2.  Seller shall provide to Buyer a listing of all new vehicles for which executory contracts are in effect on the Closing Date.

1.4.  Obligations not Assumed.  Buyer shall not assume or pay:

(a)  Any leases, equipment leases, computer or software leases or signage leases;

(b)  Any employee contracts, obligations, benefits, pension obligations, deferred compensation, retirement or severance benefits, accrued vacation, wages or compensation, salaries, bonuses, commissions, insurance or COBRA obligations for any of Seller's employees even if Buyer subsequently employs some or all of them to the extent any such obligations exist. Sales commission set forth in Section 1.3.1 herein are excepted;

(c)  Any environmental liability obligations or liabilities; and

(d)  Any other obligation of Seller except as expressly set forth herein.

(e)  No tax obligations of Seller.

2

1.5.   Taxes. The parties hereto shall be responsible for taxes applicable to the Assets, or as a result of the sale or the transfer thereof as provided for herein, as follows:

(a) Personal Property Taxes. All personal property taxes for the current fiscal year which have been levied or assessed with respect to the Assets being sold hereunder shall be prorated at the time of Closing with Seller to pay that portion allocated to the Assets prior to Closing and Buyer to pay the remaining portion thereof when due.

(b) Seller shall pay all income, capital gains taxes and the like as a result of the sale.

(c) Sales and Use Taxes. Seller shall pay all sales and use taxes incurred prior to the Closing hereunder.

(d) Tax Clearances. Seller shall furnish to Buyer at the time of Closing appropriate certificates from state and/or local officials or agencies through the calendar quarter or month prior to Closing (as appropriate), indicating that all sales taxes and unemployment insurance contributions payable by Seller have been paid or adequately provided for.

(e) Seller shall deliver to Buyer a Waiver of Lien as provided for in M.G.L.Chapter 62C, Section 52.

1.6.   Certificate of Good Standing. At the Closing Seller shall provide a certificate of good standing from the Secretary of the Commonwealth of Massachusetts evidencing the good standing of Seller.

2.   PURCHASE PRICE AND MODE OF PAYMENT.

2.1.   On the Closing Date, Buyer shall pay for the Assets described in Section 1.1 hereof the purchase price (collectively, the "Purchase Price") as set forth below:

2.1.1.   Mercedes-Benz Franchise. The purchase price for the Mercedes Benz Franchise defined under Section 1.1 and related goodwill shall be ███████████
████

2.1.2.   Current Mercedes-Benz Franchise Assets and Special Tools. The purchase price for the Special Tools and other Assets defined under Section 1.1.2 shall be based on the appraised fair market value of such Special Tools and other Assets as determined in accordance with this Section 2.1.2. Within seven (7) days prior to Closing, Buyer shall engage an independent certified appraiser that is reasonably acceptable to Buyer and Seller, at Buyer's cost and expense; to provide an independent appraisal of the fair market value of the Mercedes-Benz Special Tools (the "Special Tools Appraisal"). Said Special Tools Appraisal shall be attached to this Agreement as part of Schedule 1.1.2.

2.1.3.   Parts and Accessories. The purchase price for Mercedes-Benz Parts and Accessories defined under Section 1.1.3 shall be based on current factory replacement cost as determined by a parts inventory and appraisal in accordance with this Section 2.1.3. Within seven (7) days prior to Closing, Buyer shall engage an independent certified appraiser

3

that is reasonably acceptable to Buyer and Seller, at Buyer's cost and expense, to take physical inventory of the Mercedes-Benz Parts and Accessories (the "Parts Inventory"). Said Parts Inventory shall be attached to this Agreement as Schedule 2.1.3. The Parts Inventory shall include all new, originally packaged, usable, genuine current and returnable parts and accessories, that are, in saleable condition, as listed in the current Mercedes-Benz price catalog. Seller shall maintain the Parts and Accessories at a commercially reasonable level from the date of the Parts Inventory up to and including the Closing Date. Any inventories not purchased hereunder shall remain the property of Seller.

2.1.4.   Vehicle Inventories.   The purchase price for the New Vehicle Inventory shall be Seller's cost, less all holdbacks and year end model rebates (if any), plus: Seller's cost of dealer installed OEM options, parts and, accessories less the cost of any option or accessory removed by Seller. In addition to the purchase price as defined herein, Buyer shall pay to Seller the amount of the Manufacturer's reimbursement to dealer for preparation, delivery and inspection (P.D.I) on those vehicles purchased by Buyer on which Seller has performed the P.D.I. work and on which Buyer will receive the reimbursement from the Manufacturer. Buyer shall have the right, at or prior to the Closing Date, to inspect all vehicles being acquired by Buyer and Buyer shall be entitled to a credit for the cost of any damaged or missing items.

2.2.   Payment of Purchase Price. The Purchase Price shall be paid by Buyer to Seller at Closing as follows:

2.2.1.   ███████████   wire transfer, in certified funds, or cashier's check,

2.2.2.   The amounts determined Sections 2.1.2, 2.1.3 and 2.1.4 by wire transfer, in certified funds, or cashier's check, subject to pay-off of Seller's floor plan financing for New Vehicle Inventory, and

2.2.3.   ███████████, to be paid by Buyer through the execution of a promissory note (the "Promissory Note") providing for the payment to Seller of ██████ which on shall be due and payable on the dates that are six months, twelve months, eighteen months and twenty-four months immediately following the Closing Date (the "Deferred Purchase Price"). A copy of said Promissory Note is annexed hereto as Exhibit "A".

2.3.   Allocation. Seller and Buyer shall (i) report the transfer of Assets and the amount of consideration paid pursuant to this Agreement consistent with the terms and allocations contained in this Agreement, on any return, information statement or other written submission to any federal, state or local taxing authority, and (ii) comply with, and furnish information required by, Section of 1060 of the Internal Revenue Code of 1986, as amended and any Treasury regulations thereunder.

3.   CLOSING.

3.1.   Closing Date. The Closing shall take place at the offices of Nutter, McClennen & Fish, LLP, 155 Seaport Boulevard, Boston, Massachusetts, or at such other place as the parties shall mutually agree. The Closing shall take place at 10:00 AM on a date (the

4

"Closing Date") within forty-five (45) days after receipt of Approvals (as defined in Section 8) but not later than October 31, 2010 (the "Closing Date") unless otherwise mutually agreed to by the parties. Notwithstanding the foregoing, Buyer, Seller and Parent agree to use their respective reasonable best efforts to close the transactions contemplated by the Agreement on September 30, 2010.

Buyer shall identify the final Closing Date, consistent with this Section 3.1, by written notice to Seller according to the terms of this Agreement, which date shall be at least seven (7) days subsequent to the date of notice.

3.2.    Instruments of Conveyance And Transfer. On the Closing Date, Seller shall deliver to Buyer a bill of sale, assignments and other good and sufficient instruments of conveyance and transfer, as shall be effective to vest in Buyer good and marketable title in and to the Assets. Simultaneously with and after such delivery, Seller will take all additional steps as may be necessary to put Buyer in possession and operating control of the Assets and of the business theretofore operated by Seller at the Closing.

3.3.    Expenses Except as otherwise set forth herein, each party hereto shall pay all of its own expenses incurred in connection with the transactions contemplated hereby, regardless of whether the contemplated transaction closes.

3.4.    Pre-Closing Casualty Prior to Closing the risk of loss with respect to the Assets shall remain with Seller. Notwithstanding any casualty, the Buyer shall have the right to conclude the purchase of the Assets set forth in Sections 1.1.1 and 1.1.5 together with or any of the Assets which are undamaged or unaffected (as to value, resale ability or otherwise) set forth in Sections 1.1.2, 1.1.3 or 1.1.4. Assets in said Sections damaged or affected by such casualty shall be excluded from the sale.

4.    SELLER'S REPRESENTATIONS.

To induce Buyer to enter into this Agreement, as of the date hereof and as of the Closing Date, Seller represents and warrants that:

4.1.    Title. Seller will convey to Buyer at Closing good and marketable title to the Assets being sold hereunder, free and clear of all liens, claims, encumbrances and interests of all parties whatsoever. Seller shall discharge any liens, claims of adverse interest or security interests against the Assets out of the proceeds of the Closing hereunder.

4.2.    Power and Authority. Seller is a corporation, duly organized and validly existing in good standing under the laws of the Commonwealth of Massachusetts, and has all requisite power to carry on its business as now being conducted.

4.3.    Authority: Execution, Delivery and Performance of Agreement. Seller has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby; all proceedings required to be taken by Seller to authorize the execution and delivery of this Agreement by Seller and the performance by Seller of this Agreement and the consummation of the transactions contemplated hereby have been, or prior to the Closing shall have been, properly taken; and this Agreement constitutes the valid and binding obligation of Seller enforceable in accordance with its terms.

5

      4.4.   Non-Contravention. The consummation of the transaction contemplated by this Agreement and compliance hereof will not conflict with or result in a breach of the terms, conditions or provisions of the Charter or By-Laws of Seller or of any material contract to which Seller is a party or as to any litigation to which Seller is a party.

      4.5.   Encumbrances. Seller states that the cash portions of the Purchase Price set forth in Sections 2.2.1 and 2.2.2 are sufficient to discharge all encumbrances, floor plan liens and tax liens against the Assets including, without limitation, the partial release and discharge of the Assets as collateral under all UCC-1 filings of record (as they relate to the Assets).

5.     COVENANTS OF SELLER.

      5.1.   Conduct of Business Pending Closing. Seller covenants that, from and after the date hereof and until the Closing, except as otherwise consented to in writing by Buyer, Seller shall diligently conduct the business of the Dealership only in the ordinary course as conducted prior to the date hereof and consistent with prior practice and shall maintain, keep and preserve its Assets in good condition and repair and maintain insurance thereon in accordance with present practice, and will use its commercially reasonable efforts to preserve its Dealership business and organization intact.

      5.2.   Access, Information and Documents. During the period from the date hereof to the Closing, Seller will give to Buyer and to its accountants, counsel, and other representatives, reasonable access upon prior written request after normal business hours to all of the Assets, and Seller's Mercedes-Benz monthly statements for fiscal/calendar years 2007, 2008, 2009 and 2010 YTD and/or authorize Mercedes-Benz to release said documents to the Buyer.

      5.3.   Further Acts. Seller shall diligently satisfy and complete all the conditions precedent to its obligations to close and fulfill the covenants and representations given hereunder, which conditions involve actions to be taken or refrained from by Seller.

6.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER AND PARENT.

To induce Seller to enter into this Agreement, as of the date hereof and as of the Closing Date, Buyer and Parent represent, warrant and covenant to Seller that:

      6.1.   Organization and Standing. Buyer and Parent are limited liability companies, duly organized and validly existing under the laws of the state of their formation is duly qualified to conduct business in such state and any other state where the nature of its business so requires such qualification. Buyer and Parent represent that 100% of the membership interests of Buyer are owned by Parent.

      6.2.   Authority; Execution, Delivery and Performance of Agreement. Buyer and Parent have full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby; all proceedings required to be taken by Buyer and Parent to authorize the execution and delivery of this Agreement by Buyer and Parent and the performance by Buyer and Parent of this Agreement and the consummation of the transactions contemplated hereby have been, or prior to the Closing shall have been, properly taken; and this Agreement

6

constitutes the valid and binding obligation of Buyer and Parent, enforceable in accordance with its terms.

      6.3.   <u>Non-Contravention.</u> The consummation of the transaction contemplated by this Agreement and compliance hereof will not conflict with or result in a breach of the terms, conditions or provisions of the certificate of formation, operating agreement or other organizational documents of Buyer or Parent or of any material contract to which Buyer or Parent is a party or as to any litigation to which Buyer or Parent is a party.

      6.4.   Financial Capacity Each of Buyer and Parent warrants and represents that it has the financial capacity to enter into this Agreement and to consummate the transactions contemplated hereby.

7.      <u>COVENANTS OF BUYER AND PARENT.</u>

      7.1.   <u>Guaranty.</u> Parent hereby unconditionally and irrevocably guarantees to Seller the prompt performance and observation of each of the obligations of Buyer under this Agreement through the date of Closing.

      7.2.   <u>Further Acts.</u> Each of Buyer and Parent covenants that it shall use its best efforts at its sole expense to diligently satisfy and complete all the conditions precedent to its obligations to close and fulfill the covenants and representations given hereunder, which conditions involve actions to be taken through the date of Closing.

8.      <u>CONDITIONS.</u>

      8.1.   <u>Manufacturer Approval.</u> This Agreement is and subject to the receipt by Seller and Buyer of written approval by Manufacturer (on terms and conditions reasonably acceptable to Buyer) wherein Buyer will be appointed as an authorized Dealer in Seller's existing franchise territory location including, without limitation Hyannis, Massachusetts (the "Approval"). If despite Buyer's diligent effort Approval cannot be obtained as required herein on or before October 31, 2010 (the "Approval Deadline"), Buyer shall have the right, but not the obligation to terminate this Agreement, Buyer shall notify Seller in writing of Buyer's inability to obtain said Approval and of Buyer's intention to terminate this Agreement. Said notice, in order to be effective, must be sent by Buyer to Seller according to the terms of this Agreement, no later than the Approval Deadline.

      8.2.   <u>Buyer's Diligent Efforts.</u> Buyer shall use diligent efforts to obtain the Approvals provided for in Sections 8.1 Buyer shall, with the assistance of Seller to the extent necessary, and if required by the Manufacturer file an application with the Manufacturer for its approval of this transaction and the issuance of a Mercedes-Benz Passenger Car Dealer Agreement and Mercedes-Benz Light Truck Dealer Agreement, or comparable franchise agreements, in or within seven (7) days from the date of this agreement and shall provide all requisite data and information. If requested to do so, Buyer provide such additional data and information as may be reasonably requested by Manufacturer.

9.   TRANSACTIONS AT CLOSING.

At the Closing, the following transactions shall occur, all of which shall be deemed to occur simultaneously:

9.1.   Seller shall deliver or cause to be delivered to Buyer:

9.1.1.   A Bill of Sale from Seller which will effectively transfers and assigns to Buyer title to the Assets being purchased hereunder as represented herein.

9.1.2.   An assignment to Buyer of all of the interest of Seller in any certificates, permits and other documents, if any, to be delivered to Buyer at Closing.

9.1.3.   Such other documents as may be reasonably necessary to complete the transaction contemplated by this Agreement, including without limiting the generality of the foregoing, an assignment of termination rights and resignation by Seller of the Mercedes- Benz Passenger Car Dealer Agreement and Mercedes-Benz Light Truck Dealer Agreement currently held by it and appointment by assignment or by new Mercedes-Benz Dealer Agreements with the Manufacturer designating Buyer as the new Dealer.

9.1.4.   Original certificates of origin, two (2) sets of keys for all vehicles transferred, deal packets, including warranty booklets and related documentation for all vehicles.

9.1.5.   All consents and/or UCC-3 termination statements executed by holders of encumbrances against the Assets as are reasonably necessary or appropriate as determined by Buyer's Counsel to transfer ownership of all the Assets to Buyer free and clear of all liens, claims, security interests and rights of others.

9.1.6.   All customer lists and service records (electronically in Mercedes-Benz format).

9.2.   Buyer and Parent shall deliver or cause to be delivered to Seller:

9.2.1.   The funds for the Purchase Price of the Assets required pursuant to Section 2.2.1 hereof as may be adjusted herein.

9.2.2.   The Promissory Note, duly executed by Buyer and guaranteed by Buyer's Parent and substantially in the form attached hereto as Exhibit "A".

9.2.3.   Such other documents as may be reasonably necessary to complete the transactions, including without limiting the generality of the foregoing, certificates of the manager(s) of each of Buyer and Parent, dated as of the Closing Date, certifying to, and attaching (if applicable) (A) true and correct copies of the operating agreement and certificate of formation of Buyer and of Parent, each as in effect on the Closing Date; (B) the incumbency of the managers executing this Agreement, the Promissory Note and any other transaction documents to which Buyer and/or Parent is a party, as the case may be, on behalf of Buyer or Parent, respectively; and (C) true and correct copies of resolutions of the Board of Managers and/or the members of Buyer and/or Parent, as the case may be, authorizing and approving the

execution, delivery and performance of this Agreement, the Promissory Note and the other transaction documents to which Buyer or Parent is a party, as applicable, and the transactions contemplated hereby and thereby.

10.  **BROKER.**

Buyer and Seller represent to the other that neither has engaged the services of any broker, agent, finder or commission sales agent. Each party agrees to defend, indemnify and hold the other harmless from and against any and all claims, actions and demands arising out of any breach by such party of the representation contained in this Section.

11.  **INDEMNIFICATIONS.**

11.1.  Indemnification of Buyer. Seller hereby indemnifies and agrees to save Buyer and its affiliates, successors and assigns harmless of, from and against: (i) any and all obligations, liabilities, contracts, debts or assignments of Seller or any affiliate (including, without limitation, any taxes owed to any federal, state or local governmental authority or municipality and any liability of Buyer arising under bulk transfer, bulk sales, fraudulent conveyance or similar laws) and any and all losses, damages, costs and expenses relating thereto; (ii) any and all losses, damages, costs and expenses incurred as a result of inaccuracy in any representation or warranty made by Seller in this Agreement; (iii) any and all losses, damages, costs and expenses incurred as a result of a breach of any covenant made by Seller in this Agreement, if not cured by Seller within a reasonable period of time after having received from Buyer written notice of the alleged breach; and (iv) any and all losses, damages, costs and expenses incurred arising from events or transactions relating to the conduct of Seller's business occurring prior to the Closing. The indemnity by Seller set forth herein shall include any reasonable attorney's fees and costs actually incurred by Buyer.

11.2.  Indemnification of Seller.  Buyer hereby indemnifies and agrees to save Seller and its affiliates, successors and assigns harmless of, from and against (i) any losses, damages, costs and expenses incurred by Seller as a result of inaccuracy in any representation or warranty made by Buyer in this Agreement; (ii) any losses, damages, costs and expenses incurred by Seller as a result of a breach of any covenant made by Buyer in this Agreement, if not cured by Buyer within a reasonable period of time after having received from Seller written notice of the alleged breach; and (iii) any and all losses, damages, costs and expenses incurred or sustained and arising from events or transactions relating to the conduct of Buyer's business occurring after the Closing. The indemnity by Buyer herein shall include any reasonable attorney's fees and costs actually incurred by Seller.

11.3.  Procedures with respect to Indemnification.

11.3.1. The representations and warranties of Seller, Buyer and Parent set forth in this Agreement shall survive the Closing and the consummation of the transactions contemplated hereby for the period of two (2) years following the Closing, and shall be effective only with respect to any claim for indemnification which is received by the indemnifying party within such period. Each of the parties hereto shall be entitled to rely upon such representations and warranties to the extent that such party did not have actual knowledge, acquired before the

9

date hereof, from its own investigation or otherwise, of any fact at variance with any breach of any such representation or warranty.

11.3.2. Notwithstanding the provisions of Sections 11.1 or 11.2 hereof, the indemnification payable by either party pursuant thereto shall be subject to the following limitations:

(i) no party shall have any liability under clause (ii) of Section 11.1 or clause (i) or Section 11.2 unless the aggregate amount of all indemnification payments relating thereto for which such party would, but for this proviso, be liable exceeds on a cumulative basis $30,000, and then only to the extent of any such excess;

(ii) the aggregate amount of indemnification payable by either party pursuant to clause (ii) of Section 11.1 or clause (i) of Section 11.2 shall not exceed fifteen percent (15%) of the Purchase Price; and

(iii) neither party shall have any liability under Sections 11.1 or 11.2 or otherwise to the extent the liability or obligation arises as a result of any action taken or omitted to be taken by the other party.

11.3.3. The amount of any indemnification payments hereunder shall be limited to actual damages (excluding lost profits, incidental damages and consequential damages) and shall be calculated net of any amounts recovered or recoverable by the indemnified party under insurance policies with respect to such loss. If any loss subject to indemnification hereunder gives rise to a deduction against taxable income of the party seeking indemnification, any claim for indemnification for any such loss shall be reduced by the tax benefit attributable thereto.

11.3.4. Any party seeking indemnification pursuant to the provisions of this Section 11 (the "Claimant") shall promptly notify the party from whom indemnification is sought (the "Indemnitor") in writing of its claim, specifying in detail the nature of the misrepresentation, breach or non-performance upon which such claim for indemnification is based and the amount and nature of the loss expected to be incurred in connection therewith. Failure to give such notice shall not relieve the Indemnitor of its obligations to the Claimant under this Section, except to the extent that the Indemnitor is prejudiced thereby. If the Indemnitor shall agree that it would have responsibility to indemnify the Claimant for such claim, the Claimant shall give the Indemnitor full authority to defend, adjust, compromise or settle such claim, and any litigation arising therefrom, in the name of the Claimant or otherwise as the Indemnitor shall elect, provided that the Indemnitor or its counsel shall keep the Claimant fully informed of all developments and shall expeditiously defend such claim. The Indemnitor shall not, without the consent of the Claimant, (i) consent to the entry of any judgment or (ii) agree to any settlement, which does not require as an unconditional term thereof that the opposing party deliver to the Claimant a release from all liability in respect of such claim. In the event Seller does not pay to the Buyer any indemnified amounts due hereunder, the Buyer shall have the right to set off said amounts against the next successive payments due under the Promissory Note referenced in Section 2.2.3 herein.

11.4.   <u>Attorney's and Other Fees</u>. In the event of any litigation between the parties hereto to enforce any provisions or rights hereunder, or which in any way relates to the subject transaction or the relationship of the parties arising by virtue of this Agreement or where this Agreement provides a valid defense, the non-prevailing party shall pay to the prevailing party therein as determined in the discretion of a Court of Competent Jurisdiction all reasonable costs and expenses, including but not limited to reasonable attorneys', paralegal, accounting and expert witness fees and court costs incurred by the prevailing party Such fees and expenses shall also include any post judgment attorneys' fees and costs incurred in any appellate proceeding and/or in the enforcement of a judgment.

12.   <u>NOTICES</u>.

Any notices required to be given under this Agreement shall be in writing, and sent by hand delivery, nationally recognized overnight courier or sent by certified mail, return receipt requested, to the parties as follows:

<u>To Seller</u>:

Algimantas Krisciunas, President
Trans-Atlantic Motors, Inc.
25 Falmouth Road
Hyannis, MA 02601-5653
Fax No. 508-771-8079 (attn: Michelle L. Basil, Esq.)

<u>With a copy to</u>:

Michelle Basil, Esq.
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Fax No. 617-310-9477

<u>To Buyer</u>:

AMR Auto Holdings - MH, LLC
425 Providence Highway
Westwood, MA 02090

<u>With a copy to</u>:

Scott Silverman, Esquire
McCarter & English, LLP
265 Franklin Street
Boston, MA  02110

11

Either party may change the foregoing address for notification purposes by written notice sent to the other party and his attorney by certified mail, return receipt requested.

13. SELLER CONFIDENTIALITY, NON-DISCLOSURE AND NON-COMPETITION.

Seller covenants and agrees that for a period of three (3) years after closing that they will not, directly or indirectly solicit or contact the Dealership customers referenced in Section 1.1.5 and listed in the "Customer Lists" for the purposes of performing post sales Mercedes-Benz service work (warranty or customer pay) and Seller will not conduct such service work on Mercedes-Benz vehicles by itself or through any related entity. Further, Seller agrees not to in any way sell, disseminate or disclose any of the Dealership customers as Dealership customers or their addresses to any third parties during said three (3) year term.

14. BUYER'S POST CLOSING RIGHTS.

Buyer shall have the right to store up to 20 vehicles at the Dealership premises for a period of up to ninety (90) days post closing at no cost to Buyer. Buyer shall insure said vehicles and shall have access during normal automotive sales hours to its vehicles. Buyer shall assume all responsibility for damages to said vehicles while stored at the Seller's premises and Seller shall have no liability to Buyer, Parent or any other party with respect to the loss or damage to said vehicles except for loss or damage thereto caused by Seller's willful misconduct. Provided further, during the shorter of (a) such time as Seller is operating a car dealership on the existing premises in Hyannis, MA, and (b) one year from the Closing Date, (i) Seller will provide visible signs inside the service reception area, as well as on the door leading into the service reception area, and a reasonably sized, free-standing sign inside the sales entrance area, directing Mercedes-Benz customers to Buyer at Buyer's designated address, (ii) Seller will make available to any Mercedes-Benz customer that visits Seller's facilities seeking Mercedes-Benz service a pamphlet providing directions to Buyer's facility, and (iii) the Seller's phone service menu will inform customers inquiring about Mercedes-Benz of Buyer's Westwood dealership. Said signage to be at Buyer's expense.

15. BINDING EFFECT.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, administrators, successors, executors, designees and permitted assigns, if any. Buyer shall have the right to assign to or to designate an entity to take title to the Assets as long as such entity is owned and controlled by Buyer's principals and has the financial capacity to acquire the Assets.

16. GENDER.

In all references herein to any parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

17. ENTIRE AGREEMENT.

This Agreement and the schedules and agreements referred to herein contain the entire Agreement between Seller, Buyer and Parent with respect to the Assets and supersedes any prior agreement between the parties hereto, and may not be modified or amended except by written agreement.

18.   SECTION HEADINGS.

The Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or any Section hereof.

19.   GOVERNING LAW.

The execution, delivery and performance of this Agreement will be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts.  The parties hereby submit to the jurisdiction of the Courts of the Commonwealth of Massachusetts for the resolution of all disputes hereunder.  Each party does hereby waive its right to trial by jury in any matter litigated pursuant to or as a result of the agreements herein made and do hereby waive any claims for punitive or consequential damages.

20.   PARTIAL INVALIDITY.

In the event that any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction for any reason, unless such provision is narrowed by judicial construction, this Agreement shall, as to such jurisdiction, be construed as if such invalid, prohibited or unenforceable provision had been more narrowly drawn so as not to be invalid, prohibited or unenforceable. If, notwithstanding the foregoing, any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction for any reason, such provision, as to such jurisdiction, shall be ineffective to the extent of such invalidity, prohibition or unenforceability, without invalidating the remaining portion of such provision or the other provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. In the event of an alleged breach of this Agreement by any party hereto, the non-breaching parties shall be entitled to their remedies at law or in equity, with the provision that any such breach which is discovered after Closing shall not relieve the non-breaching party of his obligations hereunder.

21.   NO WAIVER.

No waiver or any breach or default hereunder shall be considered valid unless in writing and signed by the party giving such waiver, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

22.   MANUFACTURER AGREEMENTS.

This Agreement is subject to the terms of any agreement by and between Seller and the Manufacturer, including, without limitation, the requirements with respect to the Sale of Assets or Ownership Interest and the Right of First Refusal or Option to Purchase as set forth in the Manufacturer's standard dealership agreement forms.

23.   TERMINATION OF AGREEMENT.

13

This Agreement and the transactions contemplated herein may be terminated at or prior to the Closing Date as follows:

23.1.   Basis for Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

A.   By mutual written agreement of Buyer and Seller;

B.   By Buyer or Seller if:

(i)   any court of competent jurisdiction or other governmental body shall have issued an order, decree or ruling, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby;

(ii)   the Closing has not occurred on or prior to October 31, 2010 for any reason other than the breach of any provision of this Agreement by the party terminating this Agreement; provided, however, Buyer and Seller may mutually agree to an extension of the October 31, 2010 date of an appropriate time in order to satisfy the conditions required under Section 8;

(iii)   the other party breaches any of its covenants or agreements set forth herein; or

(iv)   any of the conditions set forth in Section 8 hereof has not been satisfied on or before the Approval Deadline or shall have become incapable of fulfillment not as a result of the terminating party's intentional, willful or negligent conduct.

Upon the occurrence of any of the events specified in this paragraph 21.1 (other than paragraph A hereof), written notice of such event shall forthwith be given to the other parties to this Agreement, whereupon this Agreement shall terminate.

23.2.   Effect of Termination.  In the event of the termination and abandonment of this Agreement pursuant to Section 23.1 this Agreement shall forthwith become void and be of no effect, without any liability on the part of any party or its directors, officers or shareholders. Nothing in this Section 23 shall relieve any party to this Agreement of liability for breach of this Agreement.

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

SELLER:

**TRANS-ATLANTIC MOTORS, INC.**

By: _____

Name: Algimantas Krisciunas

Title:  President/Treasurer

BUYER:

**AMR AUTO HOLDINGS-MH, LLC**


By: _____

Name:

Title:

PARENT:

**AUTOMILE HOLDINGS, LLC**


By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

SELLER:

**TRANS-ATLANTIC MOTORS, INC.**

By:_____

Name:

Title:

BUYER:

**AMR AUTO HOLDINGS-MH, LLC**

By:_____

Name: David Rosenberg

Title: Mgr

PARENT:

**AUTOMILE HOLDINGS, LLC**

By:_____

Name: Matt McGovern

Title: Manager

15

Schedule 1.1.2

ASSETS AND SPECIAL TOOLS INVENTORY

[Inventory to be completed by parties and affixed to this Agreement within 7 days prior
to Closing.]

16

Schedule 2.1.3

PARTS AND ACCESSORIES INVENTORY

[Inventory to be completed and affixed to this Agreement within 7 Days prior to Closing.]

17

M&E Black-Lined 7/21/10

EXHIBIT A

PROMISSORY NOTE

██████████                                              _____, 2010

   FOR VALUE RECEIVED, **AMR AUTO HOLDINGS-MH, LLC**, a Delaware limited liability company ("Maker") a subsidiary of Automile Holdings, LLC, a Delaware limited liability company ("Guarantor"), promises to pay to **TRANS-ATLANTIC MOTORS, INC.**, a Massachusetts corporation ("Payee"), in lawful money of the United States of America, the principal sum of ██████████████████, in the manner provided below.

   This Note has been executed and delivered pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement dated July ____, 2010 by and among Maker and Payee (the "Agreement") and is subject to certain of the terms and conditions of the Agreement, including, without limitation, the right of set-off set forth in Section 11.3.4. Capitalized terms used in this Note without definition shall have the respective meanings set forth in the Agreement.

   1.   Payment This Note shall be due and payable in ████████████████ ███████████, which installments shall be due and payable on _____, 20__, _____, 2011, _____, 2011, and _____, 2012 [INSERT DATES] THAT ARE SIX. TWELVE. EIGHTEEN. AND TWENTY-FOUR MONTHS FOLLOWING THE CLOSING DATE (each, a "Payment Date") If a Payment Date falls on a day that is not a business day, such payment shall be due on the next succeeding business day. All payments hereunder shall be delivered to the Payee by wire transfer to the account of Payee designated in writing by Algimantas Krisciunas, President of Payee, or by check delivered to the Payee at the address set forth in Section 6 below.

   2.   Prepayment. Maker may, without premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding principal balance due under this Note.

   3.   Default. This Note shall become immediately due and payable in the Payee's sole discretion, without notice or demand upon the occurrence at any time of any of the following events (each, an "Event of Default")

   (a)   Maker defaults in making any payment of principal under this Note, as and when the same shall become due and payable, provided that Maker has not cured any such default within ten (10) days after written notice thereof;

   (b)   Either Maker or Guarantor (i) commences any case, proceeding or other action (a) under any law relating to bankruptcy, insolvency, reorganization, liquidation, receivership or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition, or other relief with respect to it or its debts, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or shall make a general assignment for the benefit of its creditors, (ii) is the debtor named in any other case, proceeding or other action of a nature

referred to in clause (i) above which (x) results in the entry of an order for relief or any such adjudication or appointment or (y) remains undismissed, undischarged or unbonded for a period of sixty (60) days, (iii) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i) or (ii) above, or (iv) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(c)     Either Maker or any Guarantor commits a material breach of the Agreement, provided the Payee shall have given Maker written notice of any such breach which is capable of being cured and Maker shall have not cured such breach within ten (10) days of such notice, provided further, that in the event that Maker or Guarantor contests in good faith the Payee's allegation of such a breach, pending the completion of the process or proceeding to determine whether such a breach has occurred, no Event of Default shall be deemed to have occurred as a result of such breach until a final determination from such process or proceeding is obtained that a breach has occurred.

4.     Late Interest. Following an uncured Event of Default, interest shall commence to accrue on the principal balance outstanding at the rate of 10.0% per annum, such late interest to accrue from the date such Event of Default occurred after applicable notice and grace periods have elapsed.

5.     Waiver. No delay or omission on the part of the Payee in exercising any right hereunder shall operate as a waiver of such right or any other right of the Payee, nor shall any delay, omission or waiver on any one occasion be deemed a bar or waiver of the same or any other right on any future occasion. Except as otherwise set forth herein, the Maker, Guarantor and every endorser or guarantor of this Note, regardless of the time, order or place of signing, waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable.

6.     Amendments. None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed on behalf of the Payee and Maker expressly referring hereto and setting forth the provision so excluded, modified or amended.

7.     Notices. Payments hereunder will be deemed delivered only when actually received by the Payee. All other notices and communications hereunder shall be in writing and shall be deemed delivered if in writing addressed as provided below (a) when actually delivered, if in person, or (b) three business days after deposit in the United States mails, postage prepaid and registered or certified or (c) one business day after deposit with recognized overnight courier service in accordance with the standard procedures of such courier, in each case to the following addresses: (i) if to the Holder, c/o Algimantas Krisciunas, President, Trans-Atlantic Motors, Inc., 25 Falmouth Road, Hyannis, MA 02601- 5653 and (ii) if to the Maker, 425 Providence Highway, Westwood, MA 02090. Either party may change the foregoing address for notification purposes (and in the case of Payee for purposes of the payments to be made pursuant to Section 1) by written notice sent to the other party.

2

     8.    <u>Governing Law.</u> This Note will be governed by the laws of the Commonwealth of Massachusetts without regard to its conflicts of laws principles.

     9.    <u>Non-Assignability</u>.  This Note shall be non-negotiable and non-assignable by the Payee hereof.

     10.    <u>Due on Sale</u>.  This Note shall become immediately due or payable in the event of the sale of all or substantially all of the assets or a majority of the membership interest of Maker or the Guarantor (as defined below) to an unrelated third party entity.  Any sale or transfer of all or a portion of the assets or membership interest to an entity owned or controlled by the Maker or Guarantor shall not trigger this due on sale clause.

[Signature Page Follows]

3

IN WITNESS WHEREOF, Maker has executed and delivered this Note under seal as of the date first stated above.

AMR AUTO HOLDINGS-MH, LLC

By:_____

Name:

Title:

The undersigned Guarantor hereby unconditionally and irrevocably guarantees to the Payee (a) the due and punctual payment, when due in accordance with the terms hereof, of all amounts payable by the Maker to the Payee hereunder, and (b) the prompt performance and observation of every agreement and condition in this Note to be performed or observed by the Maker. The obligations of the Guarantor hereunder are unconditional and absolute, and shall survive until all indebtedness and other obligations represented by this Note (the "Obligations") shall have been fully, completely and finally satisfied and paid.

Guarantor's guarantee shall not be impaired irrespective of (i) any lack of validity or enforceability of this Note against the Maker; (ii) any modification, supplement, extension, amendment, release or other change in the terms of this Note; or (iii) any other circumstances which might otherwise constitute a defense available to, or a discharge of, the obligations of the Maker under this Note (other than payment or satisfaction of the Obligations).

Guarantor hereby waives any notice of default or nonpayment or of late or inadequate satisfaction in regard to the Obligations. In particular (and not in limitation of the foregoing), Guarantor hereby agrees that in enforcing this Guaranty the Payee shall not be required (i) to demand payment of the amount due (known as "demand"); (ii) to present for payment any evidence of any of the Obligations (known as "presentment" or "presentment for payment"); (iii) to give notice that amounts due have not been paid (known as "notice of dishonor"); or (iv) to obtain an official certification of nonpayment (known as "protest") or to give Guarantor notice of any such "protest;" and Guarantor hereby waives demand, presentment, presentment for payment, notice of dishonor, protest and notice of protest, as aforesaid. Guarantor hereby further waives notice of acceptance hereof and any and all other notices to which Guarantor may be entitled.

AUTOMILE HOLDINGS, LLC

By:_____

Name:

4